(56 Misc. Rep. 75)

FAMULARO v. OIL WELL SUPPLY CO.

(Supreme Court, Trial Term, Oswego County.    September 9, 1907.)

1. MASTER AND SERVANT—INJURIES TO SERVANT—DEFECTIVE APPLIANCE—EVIDENCE.

Where, in an action for injuries to a servant by the fall of certain iron plates which were being moved about defendant's shop by means of a crane, plaintiff claimed that one of the hooks attached to the plates was defective, but his only witness as to the inadequacy of the hook testified that it was absolutely safe if the load did not extend above the upright part or shank, and it was shown that the load by which plaintiff was injured did not extend beyond the top of the shank, the inadequacy of the hook was not shown to have caused the injury.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 34, Master and Servant, §§ 958, 961.]

2. SAME—INCOMPETENT SERVANTS.

   In an action by plaintiff, an employé in defendant's iron works, for personal injuries, *held*, that the evidence was sufficient to warrant a finding that the injury was caused by the negligence of one of defendant's servants, due to inexperience, for which defendant was liable.

   [Ed. Note.—For cases in point, see Cent. Dig. vol. 34, Master and Servant, §§ 978–980.]

Action by Bartolo Famularo against the Oil Well Supply Company. On motion for nonsuit at the close of all the evidence, the decision of which was reserved pending submission of the case to the jury. A verdict was rendered in favor of plaintiff. Motion denied.

The action was at common law by employé against employer for negligence. The alleged negligence was the furnishing of a defective appliance, the failure to give instructions in the use of an appliance, and the employment of an incompetent servant.

D. P. Morehouse and Francis D. Culkin, for plaintiff.

W. P. Goodelle, H. L. Howe, and George L. Roberts, for defendant.

DE ANGELIS, J. The defendant is a foreign corporation organized under the laws of the state of Pennsylvania, engaged in manufacturing, among other things, boilers for steam engines, at its plant in the city of Oswego. The jackets of these boilers are made from steel or iron plates from ten to twelve feet in length, four feet in width, and one-quarter of an inch in thickness. There are two departments in the defendant's plant, one known as "No. 1," or the "East or Old Shop," and the other known as "No. 2," or the "West or New Shop."

In the west shop, or No. 2, there was a crane used for moving heavy material, and among other things these plates. The construction of this crane was after this manner: There was what was called a "bridge" near the roof, extending from east to west, about 23 feet from the floor, to each end of which wheels were adjusted which ran on a track, so that this bridge could be moved from one end of the shop to the other, north and south. Upon this bridge was a carriage so arranged as to move on wheels on a track from one end of the bridge to the other, and so from one side of the shop to the other, east and west. There was also attached to this carriage a revolving drum, and attached to the drum was a cable which by the revolutions of the drum could be raised or lowered. To that cable by means of blocks and chains there were attached two large hooks of steel or wrought iron which were adjusted to the load to be carried. At the west end of the bridge and hanging from it was a wire carriage or cage, in which a man known as the "crane man" operated the crane by means of electrical appliances. There were in the cage three levers by which he controlled the operation of the crane. By one of these levers the load could be raised or lowered, the movement of the lever one way raising the load and reversing the lever lowering the load, and by another lever in the same manner the load could be moved east or west, and by the third lever, in the same manner, the load could be moved north or south, so that a load by the use of this crane could be taken from or to any point in that shop. There was a pair of small hooks for carrying light loads, suspended by a cable from another drum on the

carriage, which was operated by a fourth lever in the cage. At the time of the accident this west shop was occupied by many employés of the defendant and by material in various stages of the work upon it; but there were passageways through which the crane could carry its load. At the southeast corner of this shop the plates were trimmed by shears, and the place was referred to as "the shears." It appears that there was an employé whose principal duty was to attend to and follow the load carried by the crane. He attended to the adjustment of the hooks to the load, followed the load to its destination, and released the load from the crane. He was called the "hooker-on." The jury might have found that other employés of·the defendant were accustomed to perform the work of the hooker-on fully half of the time, and that the plaintiff was justified in the performance of that service at the time of the accident.

In No. 1, or the east shop, the plates were rolled into shape by means of machinery called "rolls," referred to as "the rolls." A track ran to this place from a point in No. 2 near the division line between the shops and midway from north to south, on which a car or truck was run to carry the plates from the crane to "the rolls." The platform of this car was about four by five feet and two feet from the floor. The crane man from his cage had a general survey of the shop. In operating the crane he was assisted by signals that were given to him by the hand or hands of the hooker-on or person in charge of the load. There were signals to carry the load to particular places, like the shears and the rolls. Then there were signals to move the load east or west or raise or lower it. The signal to raise the load was given by raising the hand palm upwards. The signal to go east or west was given by a wave of the hand in the direction indicated.

The plaintiff testified that the night before the accident the foreman of the works told him to take some plates from "the shears" the next morning to "the rolls"; that the next morning, being October 23, 1902, he hooked the crane to a load of 10 or 11 plates, one on top of another, at "the shears." In order that the load should properly carry, the hooks should have been adjusted one on each side of the pile of plates at the bottom and in the middle, so that the ends of the load would balance. The plaintiff testified that after adjusting the hooks he gave the signal to the crane man to raise the plates, and they were raised 3 feet from the floor; that then he signaled the crane man to move the load, and the load started west; that he alone was in charge of the load, and followed it at the rear end; that when it had moved 60 feet west it was moved northerly, he swinging it to adjust it to the northerly passage; that when opposite the track to the rolls he swung the load to the right, to follow the passage which ran east to the truck which was to take the load and carry it into No. 1 to the rolls. The plaintiff testified that when near the truck he gave the signal to the crane man to raise the load so that it would clear the truck, but that the signal was not heeded, and the east end of the plates came in contact with the truck, the hooks slipped off, and the plates fell on his right leg, crushing it and causing him other bodily harm. The plaintiff claims that the hook on the right side or the south side of the load

of plates, as the load was in the position in which it fell, was defective, or the plates would not have fallen.

The two hooks as they were originally constructed were alike. They weighed about 35 or 40 pounds each, and were made of steel or wrought iron. The part of each hook that went under the load was about 6 inches in length, and the upright part or shank about 12 or 13 inches in length. The lower side and the upright side of the hook were straight, but the angle they formed was a little short of a right angle. About a year before the accident the hook complained of was in some way broken by a sledgehammer just at the angle, and when it was repaired the upright part was reduced to 7 or 8 inches and the lower part to about 5½ inches. The plaintiff relied upon the evidence of one Peter Young, who was the hooker-on at the time of the accident, for his proof of the alleged inadequacy of the shorter hook. Young testified that he told the superintendent of the defendant that the hook as repaired was not safe to be carrying plates with. This was hearsay, and only received upon the subject of the notice to the defendant. He further testified that this hook was safe for a load not too large, and that 10 or 12 plates made a load not too large, but that it was not safe for a load beyond that. Later he testified that this hook was absolutely safe if the load did not extend above the upright part or shank of the hook. Although the plaintiff testified that the load at the time of the accident consisted of 10 or 12 plates, there was other evidence that there were 18 plates in the load. Assuming that there were 18 plates in the load, it was conclusively shown that the load would not have extended above the upright part or shank of this hook. In view of this evidence, it seems to me that the plaintiff failed to present proof to justify the submission of the question of the inadequacy of the hook to the jury. This eliminates the question as to instructions.

The fact that the hook complained of had been used in the shop continuously from the time it was repaired down to the time of the accident, a period of 11 months, and had been used from that time down to about the date of the trial, when it was removed to be offered in evidence, a period of 4½ years, without an accident or any trouble whatever; the fact that the only criticism made upon the hook came from a hooker-on, who frankly testified that it was perfectly safe to carry the load with which it was freighted at the time of the accident; and the fact that the evidence upon the part of the defendant that it was a perfectly safe appliance was so cogent—have some moral effect upon the situation.

The plaintiff claims that Thomas Lacey, the crane man, was incompetent by reason of inexperience, and that his failure to respond to the plaintiff's signal to raise the load was the result of that incompetence and a cause of the accident. It appeared that Lacey called himself a laborer, but had been employed in mechanical work for a period of years. He had been employed in the defendant's shops, and was familiar with them. He was 25 years of age. It appears that he had operated the crane only one day before the accident, and that he had had with him in the cage an instructor for only a half a day. He had never operated a crane before the day preceding the accident. There is evidence on the part of the plaintiff that a new man for this posi-

tion should act under an instructor for two or three days before being permitted to operate the crane alone. I think that the evidence required the court to submit to the jury the question of the crane man's incompetency. The finding of incompetency would not have been enough. The alleged negligent act must have been due to that incompetency. The claim of the plaintiff is that the failure of the crane man to respond to the signal to raise the load was a negligent act, due to the crane man's lack of experience, and resulting in the collision and falling of the load and the injuries to the plaintiff. I have no difficulty in recognizing the distinction ·between an act of an incompetent servant which is not due to his incompetency and an act which is due to his incompetency. Wright v. N. Y. C. R. R. Co., 25 N. Y. 562. I think the jury had a right to find that the failure of the crane man to comply with the signal was a negligent act, and that the act was due to the inexperience of the crane man, within the authorities. Newell v. Ryan, 40 Hun, 286, affirmed in 116 N. Y. 656, 22 N. E. 1130; O'Laughlin v. N. Y. C. & H. R. R. Co., 9 N. Y. St. Rep. 384, affirmed in 113 N. Y. 623, 20 N. E. 876; Mann v. President, etc., 91 N. Y 495; Sullivan v. Metropolitan St. R. Co., 53 App. Div. 89, 65 N. Y. Supp. 842, affirmed in 170 N. Y. 570, 62 N. E. 1100.

My conclusion is that the motion for the nonsuit should be denied. Ordered accordingly.